## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| BERNADINE WILBOURN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 09-CV-2068 |
| ADVANTAGE FINANCIAL PARTNERS, | ) | |
| LLC; RUSTY RANT; LEONARD | ) | Hon. Joan H. Lefkow |
| LOMBARDO; PETER FRICANO; KELLY E. | ) | |
| MCMULLIN; KITTY JO MCMULLIN; | ) | |
| GMAC MORTGAGE, LLC; PEDRO RAMOS | ) | |
| d/b/a PV General Contractors, Inc.; and | ) | |
| UNKNOWN OWNERS, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff, Bernadine Wilbourn, has brought suit against Advantage Financial Partners,

LLC ("AFP"), Rusty Rant, Leonard Lombardo, Peter Fricano, Kelly E. McMullin and Kitty Jo

McMullin ("the McMullins"), GMAC Mortgage, LLC ("GMAC"), Pedro Ramos[1] and unknown

owners, as a result of an alleged equity-stripping scheme in which AFP and its agents induced

Wilbourn into a sale/leaseback of her home while purporting to refinance her mortgage loan.[2]

Count I is an action to quiet title against AFP, the McMullins, GMAC and unknown owners.

Count II seeks rescission of the sale/leaseback transaction under 15 U.S.C. § 1635 of the Truth in

Lending Act ("TILA") against the McMullins, GMAC, and unknown owners.  Count III alleges

---

[1] The individual parties will be referred to by their last names.

[2] This case was removed from the Circuit Court of Cook County on April 3, 2009 pursuant to 28 U.S.C. §§ 1331 and 1441.  The court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 as a result of Wilbourn's TILA claim under 15 U.S.C. § 1601 *et seq.*

a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), codified at 815 Ill. Comp. Stat. § 505/1 *et seq*, against AFP, Rantz, Lombardo, Fricano and GMAC. Count IV alleges common law fraud against AFP, Rantz, Lombardo, Fricano and GMAC. Count V seeks rescission of the sale/leaseback transaction on the basis of unconscionability against AFP, the McMullins, GMAC and unknown owners. Count VI alleges unjust enrichment by all defendants. Count VII is an action to quiet title specifically against Ramos. GMAC, the McMullins, and Fricano move to dismiss multiple counts pursuant to Federal Rule of Civil Procedure 12(b)(6). GMAC seeks dismissal of counts I, II, III, IV, V, and VI. The McMullins seek dismissal of counts I, II, V, and VI. Fricano seeks dismissal of counts III, IV, and VI, and asks the court to strike Wilbourn's prayer for punitive damages in Counts III and IV. Additionally, GMAC and the McMullins seek dismissal of the amended complaint for failure to comply with Federal Rule of Civil Procedure 9(b). For the reasons set forth below, defendants' motions [#28, #31, #41, #46] are granted in part and denied in part.

## RELEVANT FACTS[3]

On September 10, 1998, Wilbourn purchased a single family home ("the home") located at 1042 N. Avers Avenue, Chicago, for $79,900. This is the only home Wilbourn has ever purchased and she lives there with six of her family members. She has an eleventh grade education and "is unsophisticated in matters of real estate sales, investment and finance." Am. Compl. ¶ 19. In connection with her purchase, she obtained a Fair Housing Act 30-year, fixed rate mortgage loan in the amount of $79,550 that required monthly payments of $800, including

---

[3] The facts in this section are taken from the First Amended Complaint (Dkt. No. 44). Although GMAC and the McMullins filed their motions to dismiss prior to the filing of the First Amended Complaint, they have asked that they stand as responsive to it. *See* Dkt. No. 43.

principal, interest, taxes, and insurance. Wilbourn remained current on her mortgage payments, and sometime around October, 2006 she sought a refinance loan for the purpose of making home repairs. Through a friend, Wilbourn learned of a man named Roy Williams who helped people obtain refinance loans. When she contacted Mr. Williams, he suggested two companies that could help her refinance, one of which was AFP. Although Wilbourn contacted both companies, only AFP responded.

## I.     The Sale/Leaseback Transaction

In late October 2006, Rantz, AFP's agent, informed Wilbourn that although her credit score was low, AFP specialized in offering refinance loans to individuals with poor credit. Rantz told Wilbourn that AFP could provide a refinance loan with the same monthly payment amount that she was currently making on her mortgage. In addition, Rantz told Wilbourn that AFP would help raise her credit score so that she could refinance at a lower interest rate after one year. Later that month, Lombardo, an agent of AFP, conducted an appraisal of the home. Wilbourn was not provided with a copy of the appraisal.

On November 14, 2006, Wilbourn met with Rantz, Lombardo, Lombardo's colleague, and Fricano, an attorney for AFP, at AFP's office in Glendale Heights for what she understood to be the closing of her refinance loan. Wilbourn attended the meeting alone and was not represented by counsel. At the closing, Rantz and Fricano requested Wilbourn's signature on multiple documents without explaining their import, although they generally described the transaction as a refinancing agreement with AFP. Rantz told Wilbourn that after the transaction her monthly mortgage payments would continue to be $800, including principal, interest, taxes, and insurance, but that the monthly amount would increase to $1,630 after two years. Rantz

assured Wilbourn that she could refinance at a lower rate before the larger payments became due. The documents Wilbourn signed at the closing included a Residence Lease ("Lease"), an Option Rider to a Residential Real Estate Sales Contract ("Option"), and a HUD-1 Settlement Statement ("HUD-1").

### A. The Lease

Under the Lease, Wilbourn owed AFP monthly rental payments of $1,630 from November 15, 2006 through December 31, 2007. The Lease further provided that, at signing, Wilbourn was deemed to have paid the full rent for November and December 2006 and partial rent of $830 per month for all of 2007. Wilbourn's monthly rent obligation was therefore reduced to $800 for all of 2007.

### B. The Option Rider

Under the terms of the Option, Wilbourn paid AFP a non-refundable fee of $35,500 for the option to repurchase her home within the first year at a purchase price of $230,000. The expiration date on the option is listed as November 14, 2011. After the first year, the option purchase price was to be increased by 50% of the appreciation in the value of the home. In addition to the non-refundable fee, Wilbourn also paid $44,098.65 as a down payment on the option purchase price. According to the HUD-1, the $35,500 non-refundable fee and the $44,098.65 down payment were made at closing and funded from the equity in the home. The option further stated that AFP's right to sell or convey the home was at all times subject to Wilbourn's right to repurchase the home under the option.

### C. The HUD-1

The HUD-1 sets out the payment allocations for the sale/leaseback transaction. AFP purchased Wilbourn's home for $230,000. AFP's purchase was financed by a mortgage loan issued by West Suburban Bank to AFP in the amount of $207,000. AFP's payment of the $230,000 purchase price included (1) payments on Wilbourn's behalf of $77,468.16, and (2) "benefits" to Wilbourn totaling $152,531.84. The $77,468.16 in payments to Wilbourn included $74,216.14 to pay off Wilbourn's mortgage; $1,909.25 for her 2006 property taxes; and $1,342.77 for water expenses. The $152,531.84 in "benefits" to Wilbourn included $58,500 set aside for home repairs, the $35,500 non-refundable option fee, the $44,098.65 down payment on the option purchase price, $2,500.19 for November 2006 and December 2006 rent, $9,960 as partial payment of monthly rents for January 2007 to November 2007,[4] a $375 "survey credit"; and $1,598 in settlement charges. Wilbourn disputes the charges on the HUD-1 and maintains that she received a total benefit of approximately $130,000, consisting of the $74,216.14 to pay off her prior mortgage and approximately $54,900 set aside for home repairs.[5]

## II.     The McMullins' Purchase of the Home

From January 2007 to August 2008, Wilbourn received invoices from AFP and made monthly payments accordingly. Wilbourn believed she was making mortgage payments.[6] In

---

[4] The HUD-1 is inconsistent with the lease. While the lease shows that a $830 partial payment on rent was made for each month in 2007, the HUD-1 shows partial payments were made on rent only from January 2007 through November 2007. Because the total amount of partial rents is $9,960, this is consistent with 12 months of rents paid at $830, and therefore the HUD-1 appears incorrect on this point.

[5] Wilbourn alleges that she did not receive the full amount of money set aside for the home repairs, as the actual cost only came to $48,800.

[6] In January 2008, AFP notified Wilbourn that her monthly payment amount was increasing to $1,630. When she contacted Rantz, he agreed to keep her monthly payments at $800 for the rest of 2008 because the increase was not properly communicated to her, but informed her that the monthly amount would increase to $1,630 in 2009.

5

September 2008, Wilbourn received a letter from Kelly McMullin stating that he had "invested" in the property approximately one year earlier and alerted her to the fact that AFP was not forwarding Wilbourn's rent payments to the mortgage holder. Compl. ¶ 56. He asked that she contact him about her home. Wilbourn was confused by the reference to rent. When she contacted Kelly McMullin, she learned that she did not have title to the home. Kelly McMullin told Wilbourn that he purchased the home after AFP failed to pay property taxes and requested that she make her future payments to him. Wilbourn verified that the McMullins were the owners by checking with the Cook County Recorder of Deeds Office. When she tried to contact AFP, she found that the telephone numbers for AFP's agent and its office were out of service. Wilbourn made monthly payments of $800 to the McMullins from September 2008 to November 2008, but then ceased making payments.

Unbeknownst to Wilbourn, the McMullins had purchased the home on February 26, 2007 for $230,000, of which $207,000 was loaned by BankUnited under a 30-year adjustable rate mortgage loan. BankUnited subsequently assigned the mortgage to GMAC. On December 12, 2008, GMAC filed for foreclosure on the home as a result of the McMullins' failure to make payments. On December 26, 2008, the McMullins filed suit against Wilbourn seeking overdue rent in the amount of $1,760 and possession of the premises. AFP never notified Wilbourn about the sale of the home or returned the option down-payment. AFP continued to accept Wilbourn's rent payments for over a year and a half after losing title to the property.

## LEGAL STANDARD

A motion to dismiss under 12(b)(6) of the Federal Rules of Civil Procedure asserts that

the plaintiff's complaint "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When ruling on a 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.  *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002).  To survive a motion to dismiss, the plaintiff must plead facts sufficient to establish the plausibility of the requested relief.  *Ashcroft* v. *Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); *see also Bell Atl.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level." (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004))).  Additionally, a plaintiff alleging fraud must comply with Rule 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "Malice, intent, knowledge, and other conditions of a person's mind, [however], may be alleged generally."  *Id.*  Rule 9(b) is satisfied where the plaintiff pleads the "who, what, when, where, and how: the first paragraph of any newspaper story."  *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

## ANALYSIS

As an initial matter, GMAC and the McMullins both argue that Wilbourn is not entitled to seek any equitable relief because she failed to read the documents that she signed during the sale/leaseback transaction.  Both cite to *TRW Title Ins. Co.* v. *Sec. Union Title Ins. Co.* for the proposition that a plaintiff who is negligent or reckless must be denied equitable relief.  153 F.3d 822, 829 (7th Cir. 1998).  The reason for the rule barring equitable relief to a negligent or reckless plaintiff is that he "consciously disregarded the risks," not merely that he "fail[ed] to appreciate them," and therefore can be said to have caused his own loss.  *Id.*  Thus, a plaintiff's

"negligent mistake of fact [generally] won't dirty [his] hands." *Id.* Wilbourn alleges that she

signed the documents because of AFP's and its agents' misrepresentation of the sale/lease back

transaction as a refinance loan. Wilbourn did not "disregard the risks" if she was misled to

believe that the transaction amounted to a refinance loan. The rule of *TRW* does not apply to a

case such as this, where the plaintiff is an unsophisticated consumer alleged to be a victim of a

fraudulent scheme. Accordingly, Wilbourn is entitled to seek equitable relief and the court will

proceed to determine whether the she has sufficiently alleged her claims.

## I.  GMAC's and the McMullins' Motions to Dismiss the Quiet Title Claim (Count I)

Wilbourn seeks to quiet title and claims that the sale/leaseback transaction with AFP

created a loan secured by an equitable mortgage on the home. GMAC and the McMullins

respond that there was no equitable mortgage because no debt was owing and there was no

defeasance clause.[7] "An action to quiet title in property is an equitable proceeding wherein a

party seeks to remove a cloud on his title to property." *Ill. Dist. of Am. Turners, Inc.* v. *Rieger*,

770 N.E.2d 232, 240, 329 Ill. App. 3d 1063, 264 Ill. Dec. 338 (Ill. App. Ct. 2002) (citation

omitted). Under Illinois law,

> An equitable mortgage lien operates on specific property and is the right to have
> property subjected to the payment of a claim. The essential elements of an
> equitable lien are an obligation owing and a *res* to which that obligation adheres
> and which is identified with reasonable certainty.

*Pacini* v. *Regopoulos*, 665 N.E.2d 493, 499, 281 Ill. App. 3d 274, 216 Ill. Dec. 433 (Ill. App. Ct.

1996) (citations omitted). "To convert an absolute deed into a mortgage, the proof must be clear,

satisfactory and convincing and may come from almost every conceivable fact that could

---

[7] A defeasance clause is "[a] mortgage provision stating that the conveyance to the mortgagee
will be ineffective if the mortgagor pays the debt on time." BLACK'S LAW DICTIONARY 449 (8th ed.
2004).

legitimately aid that determination." *Robinson* v. *Builders Supply & Lumber Co.*, 586 N.E.2d 316, 320, 223 Ill. App. 3d 1007, 166 Ill. Dec. 358 (Ill. App. Ct. 1991) (citations omitted) (internal quotation marks omitted). The determination of "[w]hether a deed is to be considered as an equitable mortgage depends on the parties' intentions." *Id.* (citations omitted). Illinois courts look to multiple factors when determining the existence of an equitable mortgage, including

> the existence of an indebtedness, the close relationship of the parties, prior unsuccessful attempts for loans, the circumstances surrounding the transaction, the disparity of the situations of the parties, the lack of legal assistance, the unusual type of sale, the inadequacy of consideration, the way the consideration was paid, the retention of written evidence of the debt, the belief that the debt remains unpaid, an agreement to repurchase, and the continued exercise of ownership privileges and responsibilities by the seller.

*Id.* (citations omitted).

The amended complaint contains multiple allegations that suggest the parties entered into the sale/leaseback transaction for the purpose of lending Wilbourn money for home repairs, using the home to secure the debt. The allegations most relevant to the parties' intent are their communications regarding the transaction. Wilbourn contacted AFP for the purpose of obtaining a refinance loan. Rantz informed Wilbourn that AFP specialized in providing refinance loans to individuals with bad credit. He also informed Wilbourn that AFP could offer her a refinance loan with the same monthly payment amounts as her current mortgage loan. At closing, both Fricano and Rantz told Wilbourn that the transaction amounted to a refinancing agreement. When Rantz explained the payment amounts under the refinance loan, he told Wilbourn that if the monthly payment amount were to rise, she could refinance again. GMAC's and the McMullins' contention that there was no debt is belied by the parties' communications, which all

explicitly referenced the transaction as a refinance loan.

Wilbourn's allegations also suggest that an equitable mortgage may be appropriate based on circumstances other than the verbal communications between the parties. First, there was an unequal level of sophistication between the parties. Wilbourn, who has an eleventh-grade education and is unsophisticated in matters of real estate, entered into the sale/leaseback transaction with a company whose agents exhibited a thorough knowledge of real estate matters. Further, Wilbourn was not represented by an attorney at the time of the transaction whereas AFP enjoyed the presence of its attorney, who is alleged to have assisted AFP in inducing Wilbourn to sign the documents by telling her it was a refinance agreement. Wilbourn's allegations also suggest a gross inadequacy of consideration. She claims that she received a total benefit of approximately $130,000 for a home valued at $230,000. In addition, she paid AFP monthly rent of $800 just to remain living in her home. In sum, Wilbourn alleges that she was fraudulently induced into giving AFP nearly half the value of her home and then continued to pay them monthly just to remain living in it, all so that she could make home repairs that ultimately benefitted AFP by increasing the resale value.

GMAC and the McMullins assert that no equitable mortgage exists because Wilbourn did not owe a debt to AFP.[8] "While a debt relationship is essential to a mortgage, direct evidence is

---

[8] Defendants also argue that an equitable mortgage requires that the agreement between the parties contain a defeasance clause, and, relying on *Stamberg* v. *Hiller*, argue that the option to repurchase contained in the Lease does not satisfy this requirement. 190 N.E.2d 627, 41 Ill. App. 2d 229 (1963). As an initial matter, it is questionable whether a defeasance clause is a "requirement" for an equitable mortgage to exist under Illinois law because Illinois courts have often ruled that equitable mortgages were created without addressing whether there was such a clause. Rather, Illinois courts appear to focus on whether a conveyance was intended to secure a debt. *See, e.g.*, *Robinson*, 586 N.E.2d at 320; *Flack* v. *McClure*, 565 N.E.2d 131, 135, 206 Ill. App. 3d 976, 151 Ill. Dec. 860 (Ill. App. Ct. 1990). GMAC's and the McMullins' reliance on *Stamberg* is unavailing because there "[n]o debt was in existence owing from the defendant to plaintiffs at the time of the transaction which was secured by the

not necessary, and, in fact, no particular type of evidence is required." *Robinson*, 586 N.E.2d at

322 (reversing trial court's grant of summary judgment to defendant on plaintiff's equitable

mortgage claim where documents did not create indebtedness but plaintiff only signed deed after

stating that she need a loan and was offered assistance with that request, and where plaintiff

believed at all times that the transaction constituted a loan). As in *Robinson*, Wilbourn contacted

AFP to receive a loan for home repairs, was offered help with that request, and at all times

believed that the sale/leaseback transaction was a refinance loan. Furthermore, in order to regain

title to her home, Wilbourn would have had to pay $185,901.35, in addition to the $44,098.65

down payment, to satisfy with the option to repurchase her home. This is sufficient to create a

debt relationship because it supports the inference that Wilbourn owed a future debt. *See Flack*

v. *McClure*, 565 N.E.2d 131, 136, 206 Ill. App. 3d 976, 151 Ill. Dec. 860 (Ill. App. Ct. 1990)

(stating that "the fact that the [equitable] mortgage was made for a future debt or that there was

no fixed time for repayment does not affect the status of an instrument as a mortgage" and

affirming trial court's judgment that an equitable mortgage was created where the defendants

agreed that they would have returned the quitclaim deed signed by the plaintiff had the plaintiff

returned the $9,000 loan from the defendants (citation omitted)). Federal courts have rejected

similar arguments under similar circumstances. *See, e.g., Perry* v. *Queen*, No 05-0599, 2006 WL

481666, at *4 (M.D. Tenn. Feb. 27, 2006) (denying motion to dismiss where, as in *Flack*,

defendants had agreed to return the warranty deed to plaintiff once he repaid the loan, fee and

amount of mortgages); *Rowland* v. *Haven Properties, LLC*, No. 05 C 1957, 2005 WL 1528264,

conveyance, and there was no debt connected with the conveyance of the property during the course of
the dealings between the parties." *Id.* at 629. Here, as discussed in the text, the transaction created an
equitable mortgage debt of approximately $150,000, the balance owed on the option to repurchase the
home.

at *4-5 (N.D. Ill. June 24, 2005) (stating that "indebtedness is only one of the many factors that may be considered in evaluating the existence of an equitable mortgage" and denying motion to dismiss where plaintiff entered into a sale/leaseback transaction with the belief that it was a refinancing loan and received inadequate consideration); *Hruby* v. *Larsen*, No. 05-894, 2005 WL 1540130, at *3 (D. Minn. June 30, 2005) (granting plaintiff's motion for a preliminary injunction to enjoin defendants from evicting plaintiffs where a loan secured by an equitable mortgage was likely created by defendants simultaneous purchase and resale of the plaintiffs' home). As discussed above, Wilbourn has pleaded sufficient factual allegations to permit an inference that the sale/leaseback transaction with AFP created a loan secured by an equitable mortgage. Accordingly, the court will deny GMAC's and the McMullins' motions to dismiss Count I for quiet title.[9]

## II.     GMAC's and the McMullins' Motions to Dismiss the TILA Claim (Count II)

As a threshold matter, both GMAC and the McMullin's argue that Wilbourn has failed to allege that there was an extension of credit, an essential element of a TILA claim. A transaction for "credit" is defined in TILA as one that includes "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e). A "consumer" is an individual "to whom credit is offered or extended . . . and the money, property,

_____

[9] The McMullins also argue that they were bona fide purchasers of the property. While "[b]ona fide purchase is a valid affirmative defense for which the defendant bears the burden of proof," *Davis* v. *Elite Mortgage Services, Inc.*, 592 F. Supp. 2d 1052, 1056 (N.D. Ill. 2009) (citation omitted), affirmative defenses are not relevant to the court's consideration of a 12(b)(6) motion to dismiss. *See Carr* v. *Tillery*, 591 F.3d 909, 913 (7th Cir. 2010) ("[T]he defendant should raise [an affirmative defense] and then move for judgment on the pleadings under Rule 12(c)." (citing *Forty One News, Inc.* v. *County of Lake*, 491 F.3d 662, 664 (7th Cir. 2007))); *Evergreen Media Corp.* v. *Radio & Television Broad. Engineers Local 1220, Bhd. of Elec. Workers*, 983 F. Supp. 731, 737 (N.D. Ill. 1997) (The nature of an affirmative defense is that the defendant "admit[s] the allegations of the complaint but suggest[s] some other reason why there is no right of recovery." (citation omitted) (internal quotation marks omitted)).

or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(h). Because Wilbourn has sufficiently alleged that the sale/leaseback transaction, which Wilbourn sought to make home repairs, created an equitable mortgage, she has adequately pled the existence of a credit transaction with the meaning of TILA. *See Rowland*, 2005 WL 1528264, at *5 (denying defendant's motion to dismiss a TILA claim based on an alleged equitable mortgage).

GMAC further argues that Wilbourn does not have standing to bring a claim under TILA and that, in any case, the claim is time-barred under the applicable statute of limitations. The court turns first to the issue of whether Wilbourn has standing to seek rescission against GMAC. Under section 125 of TILA, a consumer has three years to rescind a "consumer credit transaction . . . in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended" if the creditor fails to provide notice of the debtor's right to rescind. 15 U.S.C. § 1635(a), (f); 12 C.F.R. § 226.23(a)(3).[10] The statute further provides that "[a]ny consumer who has the right to rescind a transaction under section 125 [15 U.S.C. § 1635] may rescind the transaction as against any assignee of the obligation." 15 U.S.C. § 1641©. Because TILA does not provide a definition of who qualifies as an "assignee," the court looks to ordinary usage of the term "assignment" to determine whether the GMAC and the McMullins may be considered assignees under the statute. "To assign" is "[t]o convey; to transfer rights or property." BLACK'S LAW DICTIONARY 127 (8th ed. 2004). Under the common usage, both the

---

[10] Under TILA, creditors are required to make various disclosures, including the right to rescind. *See* 12 C.F.R. §§ 226.17, 226.18, and 226.23.

McMullins and GMAC are "assignee[s] of the obligation" because each was the transferee of

AFP's alleged equitable mortgage in the home: AFP conveyed its interest in the home to the

McMullins for $230,000 on February 26, 2007 and, on the same day, the McMullins entered into

a mortgage loan with BankUnited for $207,000, which was secured by their interest in the home;

BankUnited subsequently assigned the mortgage to GMAC. Furthermore, the court is mindful

that TILA's "right to rescission 'encompasses a right to return to the *status quo* that existed

before the loan.'" *Handy* v. *Anchor Mortgage Corp.*, 464 F.3d 760, 765-66 (7th Cir. 2006)

(quoting *Barrett* v. J.P. Morgan Chase Bank N.A., 445 F.3d 874, 878 (6th Cir. 2006)). Thus, it is

consistent with the purposes of TILA to consider GMAC an assignee of the obligation because it

is necessary to facilitate a full "unwinding" of the sale/leaseback transaction. *Id*. at 765.

Accordingly, Wilbourn has sufficiently alleged that GMAC is an assignee within the meaning of

§ 1641©.[11] *See King* v. *Long Beach Mortgage*, No. 06-11931, 2009 U.S. Dist. LEXIS 115121,

at *23-24 (D. Mass. Dec. 9, 2009) (denying motion to dismiss brought by subsequent acquirer of

rights to the loan at issue because "[a] right belonging to the consumer [under TILA] ought not

to be extinguishable by contract between the original assignee of the mortgage and its

---

[11] To the extent GMAC is arguing that it is not an assignee within the meaning of §§ 1641(a) or 1641(e)(1), which permit consumers to maintain civil actions against the assignee of a creditor who violated TILA by failing to make the required disclosures only where the violation is "apparent on the face of the disclosure statement" and where the assignment was voluntary, the court need not address this argument because §§ 1635 and 1641(c), which deal with the consumers right to seek rescission against "assignees of the obligation," are exceptions to these notice requirements. *See Parker* v. *Potter*, 232 Fed. Appx. 861, 865 (11th Cir. 2007) ("An action for rescission under § 1635 is a distinct cause of action from a civil action for a violation of [] TILA's disclosure requirements, and assignees are liable for rescission even if a disclosure violation is not 'apparent on the face.'" (citation omitted) (internal quotation marks omitted)); *Adams* v. *Nationscredit Fin. Servs. Corp.*, 351 F. Supp. 2d 829, 834 (N.D. Ill. 2004) (citing *Latham* v. *Residential Loan Ctrs. of Am., Inc.*, No. 03 C 7094, 2004 WL 1093315, at *6 (N.D. Ill. May 5, 2004)). Because the only remedy sought against GMAC under TILA is rescission, Wilbourn need not allege that it had notice of AFP's alleged disclosure violations.

14

subsequent acquirer without the consumer's consent or input.").

In reply, GMAC first argues that it is a servicer of a loan within the meaning of 15 U.S.C. § 1641(f)(1), which exempts "a servicer of a consumer obligations arising from a consumer credit transaction . . . [from being] treated as an assignee of such obligation . . . unless the servicer is or was the owner of the obligation." Arguments first raised in reply, however, are waived. *Carter* v. *Tennant Co*., 383 F.3d 673, 678 (7th Cir. 2004). Even if GMAC had raised this argument in a timely manner, it would still be unavailing because GMAC does not qualify as loan servicer given that it purchased an assignment of the mortgage loan from BankUnited, and thereby became the owner of an interest in the home. Wilbourn's right to rescission is therefore not affected by GMAC's claim to be a servicer under § 1641(f)(1).

Lastly, GMAC argues that Wilbourn's damages claim is time-barred under TILA's statute of limitations. The statute provides that "[a]ny action under [TILA] may be brought in any United States district court . . . within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). GMAC argues that this time limit has been exceeded because the sale/lease  transaction, and thus AFP's failure to give the required notice under TILA, occurred on March 19, 2006, more than two years before she commenced this action in state court on March 19, 2009. GMAC's argument is unpersuasive, however, because Wilbourn premises her TILA claims against the McMullins and GMAC on their "failure[s] to rescind [which constitute] separate violation[s] of TILA." *Dowdy* v. *First Metro. Mortgage Co.*, No. 01 C 7211, 2002 WL 745851, at *2 (N.D. Ill. Jan. 29, 2002) (claim based on plaintiffs' right to rescind a credit transaction under TILA not barred by the statute of limitations where the original complaint was filed on September 18, 2001 and plaintiffs gave notice of rescission on September

17, 2001 even though loan at issue closed on April 3, 1999). Wilbourn alleges that she properly

exercised her right to rescind by giving notice to the McMullin's via a letter dated March 19,

2009.[12] Compl. ¶¶ 128-133 and Ex. Q attached thereto. GMAC provides no support for the

proposition that this is deficient notice. Thus, GMAC's and the McMullins' motion to dismiss

Count II will be denied.

### III. GMAC's and the McMullins' Motions to Dismiss the Rescission of Contract/Unconscionability Claim (Count V)

Wilbourn argues that the sale/leaseback transaction with AFP was unconscionable and

seeks rescission of the entire transaction and all subsequent deed transfers on the basis that they

are void and unenforceable. Under Illinois law, "[a] finding of unconscionability may be based

on either procedural or substantive unconscionability, or a combination of both." *Kinkel* v.

*Cingular Wireless LLC*, 857 N.E.2d 250, 263, 223 Ill. 2d 1, 306 Ill. Dec. 157 (2006) (citing

*Razor* v. *Hyundai Motor Am.*, 854 N.E.2d 607, 622, 222 Ill. 2d 75, 305 Ill. Dec. 15 (2006)).

"'Procedural unconscionability refers to a situation where a term is so difficult to find, read, or

understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it.'" *Id.*

at 264 (quoting *Razor*, 854 N.E.2d at 622). The factors relevant to whether a contract is

procedurally unconscionable include

> [A]ll the circumstances surrounding the transaction including the manner in
> which the contract was entered into, whether each party had a reasonable
> opportunity to understand the terms of the contract, and whether important terms
> were hidden in a maze of fine print; both the conspicuousness of the clause and
> the negotiations relating to it are important, albeit non conclusive factors in
> determining the issue of unconscionability.

---

[12] The regulations provide that "[t]o exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail." 12 C.F.R. § 226.23(a)(2).

*Id.* (quoting *Frank's Maint. & Eng'g, Inc.* v. *C.A. Roberts Co.*, 408 N.E.2d 403, 410, 86 Ill. App. 3d 980, 42 Ill. Dec. 25 (Ill. App. Ct. 1980)).  In essence, "[p]rocedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice."  *Frank's Maint.*, 408 N.E.2d at 410.  Substantive unconscionability, on the other hand, applies "to terms that are 'inordinately one-sided in one party's favor.'"  *Kinkel*, 857 N.E.2d at 267 (quoting *Razor*, 854 N.E.2d at 622).

GMAC and the McMullins argue that Wilbourn had a "meaningful choice" in entering into the contract because she alleges that she was aware of two companies through which she might obtain a refinancing loan.  Compl. ¶ 24.  In support of this argument, they rely on *Baker* v. *Lebolt & Co.*, which involved a simple bailment with a jeweler of two diamond rings that were lost while being appraised.  No. 83 C 4813, 1986 WL 3606, at *1 (N.D. Ill. Mar. 17, 1986) (quoting *In re Marriage of Riedy*, 474 N.E.2d 28, 33, 130 Ill. App. 3d 311, 85 Ill. Dec. 614 (Ill. App. Ct. 1985)).  Before leaving the rings with the jeweler, the plaintiff signed a document that limited the jeweler's liability to the value of the rings, which she listed as $2000.  *Id.* Nevertheless, the plaintiff sought to recover a higher sum and argued on summary judgment that the document was unconscionable.  The court ruled that the document was not unconscionable because the plaintiff had the opportunity to make a higher valuation, making the document reasonable, and could have sought a jeweler that offered better terms, indicating that the plaintiff had a "meaningful choice."  *Id.* at *2.  The nature and extent of the transactions in *Baker* and in the instant case are clearly distinguishable.  Unlike the plaintiff in *Baker* who sought to have her jewelry appraised and was given the opportunity to assess its worth in a simple bailment contract, Wilbourn sought to refinance her house and neither understood nor had any input

17

regarding the highly unfavorable terms set out in the multiple documents associated with the complicated sale/leaseback transaction. Furthermore, while the plaintiff in *Baker* might have easily sought to have her rings appraised at another jeweler, Wilbourn was an unsophisticated consumer with a low credit score that had only two names of refinance companies, only one of which – AFP – called her back. Compl. ¶ 25. During that call, Rantz is alleged to have induced Wilbourn to refinance with AFP by insinuating that it was one of the few companies who would be interested in giving her a refinance loan and promising that one of their loans would actually raise her credit score. *Id.* ¶ 26. The fact that AFP used Wilbourn's lack of sophistication and poor financial history to discourage her attempts to get a refinance loan from another company that did not "specialize" in offering refinance loans to people with poor credit further buttresses the inference that Wilbourn did not have a meaningful choice. She has therefore adequately alleged a claim of procedural unconscionability. *See, e.g.*, *Rowland*, 2005 WL 1528264, at *5 (denying defendant's motion to dismiss an unconscionability claim where plaintiff entered into sale/leaseback transaction thinking it was a refinance loan and alleged, *inter alia*, that there was unequal bargaining power between the parties and the plaintiff was not represented by an attorney).

Even if Wilbourn's allegations did not support an inference that the sale/leaseback transaction was procedurally unconscionable because she could have chosen a different refinancing company, they would still support an inference of substantive unconscionability given the transaction's highly unfavorable terms. In exchange for a $54,900 home repair loan, Wilbourn was induced to give AFP the deed to the home and to pay it monthly rent of $800, a non-refundable fee of $35,500 and a $44,098.65 down deposit for the highly unrealistic option to

later repurchase the home for the $185,901.35.[13]  Moreover, the primary benefit to Wilbourn –

the home repairs –  ultimately resulted in a benefit to AFP by raising the selling price of the

home.  Wilbourn has thus pled sufficient factual material to state a claim of procedural and/or

substantive unconscionability.  Accordingly, GMAC's and the McMullins' motions to dismiss

Count V will be denied.

## IV.    GMAC's and Fricano's Motions to Dismiss the Common Law Fraud Claim (Count IV)

GMAC and Fricano both argue that Wilbourn cannot maintain a claim of fraud against

them.  The elements of common law fraud in Illinois are:

> (1) a false statement of material fact; (2) the party making the statement knew or
> believed it to be untrue; (3) the party to whom the statement was made had a right
> to rely on the statement; (4) the party to whom the statement was made did rely
> on the statement; (5) the statement was made for the purpose of inducing the other
> party to act; and (6) the reliance by the person to whom the statement was made
> led to that person's injury

*Siegel* v. *Levy Org. Dev. Co., Inc.*, 607 N.E.2d 194, 198, 153 Ill. 2d 534, 180 Ill. Dec. 300 (1992)

(citation omitted).

### A.    GMAC's Motion

GMAC argues that it made no misrepresentations to Wilbourn and cannot be held liable

for the fraudulent conduct of others.  Wilbourn responds that GMAC was on constructive notice

of AFP's fraud and therefore is subject to Wilbourn's remedy for fraud: the right to rescind the

transaction.  Wilbourn relies on *LaSalle Bank* v. *Ferone* to argue that a mortgagee has a duty to

inquire into an occupant's interest in property when financing a buyer's purchase of the property.

---

[13]  The $230,000 option purchase price minus the down payment to the option to repurchase of
$44,098.65.

892 N.E.2d 585, 590-91, 384 Ill. App. 3d 239, 322 Ill. Dec. 948 (Ill. App. Ct. 2008). Therefore, according to Wilbourn, a mortgagee has constructive notice if a seller possibly procured title from the occupant through fraud, making the mortgagee a proper party to a fraud claim.

In *Ferone*, the defendant sought to obtain a line of credit by using her house as collateral. The defendant's friend, who was the attorney assisting her in obtaining the line of credit, asked the defendant to sign a power of attorney in order to have the house appraised but actually presented her with a deed of trust that quitclaimed her interest in the property. Subsequently, the attorney took out a mortgage on the property with the plaintiff, a bank, and eventually defaulted on the loan. The bank filed a foreclosure action and moved for summary judgment on the defendant's affirmative defense that her execution of the deed was the result of fraud. On appeal, the court held that summary judgment was inappropriate on the issue of whether the plaintiff was a bona fide mortgagee for value. The court found that the plaintiff had a duty to inquire into an occupant's interest in the property where, *inter alia*, a party other than the occupant who claimed to be the owner was attempting to obtain a mortgage on the property.

*Ferone* is distinguishable from the instant case because it involved a mortgage foreclosure action. There, the issue was whether the plaintiff was a bona fide mortgagee for value, not whether it was a proper party to a plaintiff's claim for fraud committed by a third-party. Wilbourn does not allege that GMAC made any misrepresentations to her and fails to cite any case in which a mortgagee was held to be a proper party for a claim of fraud against a third-party. Accordingly, GMAC's motion to dismiss Count IV will be granted.

**B. Fricano's Motion**

Fricano argues that Wilbourn's fraud claim against him is barred by the statute of limitations and that, in any case, it does not allege justifiable reliance and is not pled with sufficient particularity. Fricano further contends that Wilbourn's prayer for punitive damages must be stricken. Turning first to the statute of limitations issue, under Illinois law, "[a]n action for damages based on tort, contract, or otherwise [] against an attorney arising out of an act or omission in the performance of professional services . . . must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 Ill. Comp. Stat. § 5/13-214.3(b). The parties dispute whether the Illinois statute of limitations for attorneys applies when a non-client brings suit against an attorney for actions taken while representing a client. In *Ganci* v. *Blauvelt*, the coexecutor of an estate was sued, and he filed a third-party complaint seeking contribution from the attorney who drafted the will. 690 N.E.2d 649, 651, 294 Ill. App. 3d 508, 228 Ill. Dec. 890 (Ill. App. Ct. 1998). The court ruled that because the coexecutor did not allege legal malpractice resulting from the attorney's breach of duty, the statute of limitations for attorneys did not apply. *Id.* at 653. Similarly, in *Cotton* v. *Private Bank & Trust Co.*, the court held that the statute of limitations for attorneys only applied to actions arising out of the attorney-client relationship. No. 01 C 1099, 2004 WL 526739, at *3 (N.D. Ill. Mar. 12, 2004). Fricano never served as Wilbourn's attorney and therefore owed her no fiduciary duty. Thus, the Illinois statute of limitations for attorneys does not bar Wilbourn's fraud claim against Fricano.

As to whether Wilbourn adequately pleaded the elements of her fraud claim, Fricano argues that there was no justifiable reliance because he served as AFP's attorney at the time and the documents Wilbourn signed contradicted his alleged statements. In Illinois, a party's

justifiable reliance need only be reasonable. *Minch* v. *George*, 917 N.E.2d 1169, 1178, 395 Ill. App. 3d 390, 335 Ill. Dec. 105 (Ill. App. Ct. 2009). The determination of whether a party justifiably relied upon the misrepresentations of another "depends on consideration of all the surrounding circumstances." *Miller* v. *William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 9, 326 Ill. App. 3d 642, 260 Ill. Dec. 735 (Ill. App. Ct. 2001) (citation omitted). Wilbourn was unsophisticated in matters of real estate and was presented at closing with a complex real estate transaction where Fricano and other AFP agents, who were sophisticated in real estate matters, allegedly assured her that she was signing a refinance loan. As the Seventh Circuit stated in *Emery* v. *American General Finance, Inc.*, "[t]aking advantage of the vulnerable is a leitmotif of fraud." 71 F.3d 1343, 1347 (7th Cir. 1995) (citation omitted). Under these circumstances, Wilbourn's amended complaint provides a sufficient basis from which the court may infer that she reasonably relied on Fricano's alleged misrepresentations, despite Fricano's status as AFP's attorney and the conflict between his statements and the transaction documents.

Contrary to Fricano's allegations, Wilbourn's fraud allegations against Fricano are also stated with sufficient particularity under Rule 9(b). According to the amended complaint, Wilbourn, Rantz, Lombardo, Brad, and Fricano were present at the closing on November 14, 2006 at AFP's office in Glendale Heights, Illinois. At the closing, Fricano requested that Wilbourn sign documents, telling her that she was entering into a refinance loan. Wilbourn later learned that she had not entered into a refinance loan, but had sold her home to AFP, and that her payments to AFP were not mortgage payments, but rent. Thus, these allegations sufficiently state a claim of fraud against Fricano. *See DiLeo*, 901 F.2d at 627.

Lastly, Fricano argues that Wilbourn's prayers for punitive damages against him should

be stricken.[14]  He contends that Illinois law bars an award of punitive damages against an attorney engaged in the practice of law.  The statute reads in relevant part: "In all cases . . . in which the plaintiff seeks damages by reason of legal . . . malpractice, no punitive, exemplary, vindictive or aggravated damages shall be allowed."  735 Ill. Comp. Stat. § 5/2-1115.  Illinois courts only find legal malpractice under this statute, however, where the attorney-client relationship is present.  *See, e.g., Chi. Dist. Council of Carpenters Welfare Fund* v. *Gleason & Fritzshall*, 693 N.E.2d 412, 417, 295 Ill. App. 3d 719, 230 Ill. Dec. 283 (Ill. App. Ct. 1998) (citing *Cripe*, 683 N.E.2d at 518-19); *Safeway Ins. Co.* v. *Spinak*, 641 N.E.2d 834, 837-38, 267 Ill. App. 3d 513, 204 Ill. Dec. 404 (Ill. App. Ct. 1994).  Wilbourn does not allege an attorney-client relationship between Fricano and herself, and therefore her prayer for punitive damages is allowable under Illinois law.  Likewise, because Wilbourn's fraud claim against Fricano is timely and sufficiently pled, his motion to dismiss Count IV will also be denied.

## V.    GMAC's and Fricano's Motions to Dismiss the ICFA Claim (Count III)

To establish a violation of the ICFA, a plaintiff must allege "(1) a deceptive act or practice, (2) intent on the defendants' part that plaintiff rely on the deception, and (3) that the deception occurred in the course of conduct involving trade or commerce."  *Siegel*, 607 N.E.2d at 198.  "[S]o long as the alleged deception occurred in a course of conduct involving trade or commerce, facts satisfying a claim for common law fraud will necessarily satisfy a claim under the Act."  *Id.*

### A.    GMAC's Motion

---

[14]  Because Count III will be dismissed as to Fricano, the court need only address his argument to the extent that Wilbourn seeks punitive damages under Count IV for common law fraud.

As discussed *supra*, Wilbourn has neither alleged that GMAC made any misrepresentations to her, nor pointed to any cases in which a defendant is liable under ICFA for fraud committed by a third-party. "Under Illinois law, however, in order to have an action against an assignee, a plaintiff must allege and prove that the assignee's fraud is active and direct." *Brooks* v. *O'Connor Chevrolet, Inc.*, No. 02-2478, 2003 WL 22427795, at *3 (N.D. Ill. Oct. 23, 2003). Because the amended complaint contains no allegations of active and direct fraud on the part of GMAC, Wilbourn's ICFA claim against GMAC will be dismissed.

### B.      Fricano's Motion

Fricano argues that Wilbourn may not maintain a claim against him under the ICFA because attorneys are exempt from the act when engaged in the practice of law. In *Cripe* v. *Leiter*, the Illinois Supreme Court reviewed the consumer protection statutes of other states and surmised that claims arising out of the practice of law are generally thought to be outside their ambit. 703 N.E.2d 100, 103-07, 184 Ill. 2d 185, 234 Ill. Dec. 488 (1998). It further explained that, in Illinois, the conduct of attorneys has historically been subject to robust regulation by the Supreme Court, not the Illinois legislature. *Id.* Because the "attorney-client relationship in [Illinois], unlike the ordinary merchant-consumer relationship, is already more subject to extensive regulation by this court," *id.* at 197, the Court declined to conclude that the legislature intended to regulate that relationship absent any clear indication to do so. *Id.; see also Frahm* v. *Urkovich*, 447 N.E.2d 1007, 1011, 113 Ill. App. 3d 580, 69 Ill. Dec. 572 (Ill. App. Ct. 1983) ("We conclude that the legislature's use of 'trade or commerce' in defining the application of the Act was not meant to include the actual practice of law."). Accordingly, the Court ruled that "where allegations of misconduct arise from a defendant's conduct in his or her capacity as an

attorney representing a client, the Consumer Fraud Act does not apply." *Id*. at 199 (ICFA does not apply to claims for excessive billing by attorneys because billing of a client for legal services is a part of the attorney's representation of the client). Federal courts in this district, including this court, have applied this rule where, as is the case here, the plaintiff is not a client of the named attorney. *E.g., Collins* v. *Sparacio*, No. 03 C 0064, 2003 WL 21254256, at *3 (N.D. Ill. May 30, 2003) (allegedly fraudulent conduct of an attorney retained by a third-party to file debt collection suit against plaintiff was exempt from the ICFA); *Shalabi* v. *Huntington Nat'l Bank*, No. 01 C 2959, 2001 WL 777055, at *3 (N.D. Ill. July 11, 2001) (same); *Zanayed* v. *Gertler & Gertler, Ltd.*, No. 99 C 5150, 2000 WL 294183, at *2 (N.D. Ill. Mar. 20, 2000) (failure of law firm retained by plaintiff's creditor to give required notice before contacting plaintiff's employer was not actionable under the ICFA). The court is not persuaded by Wilbourn's assertion that these cases were wrongly decided. Accordingly, Wilbourn may not maintain a claim against Fricano under the ICFA and he will therefore be dismissed as a defendant from Count III.

## VI.    GMAC's, the McMullins', and Fricano's Motion to Dismiss the Unjust Enrichment Claim (Count VI)

Wilbourn claims that GMAC, the McMullins, and Fricano have received unjust enrichment as a result of the sale/leaseback transaction to the extent they received title to or value from the equity in the home. "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment and that the defendant's retention of the benefit violates the fundamental principles of justice, equity and good conscience." *Martis* v. *Pekin Mem'l Hosp. Inc.*, 917 N.E.2d 598, 606, 395 Ill. App. 3d 943, 334 Ill. Dec. 772 (Ill. App. Ct. 2009).

### A.    GMAC's and the McMullins' Motions

Both GMAC and the McMullins argue that they were not unjustly enriched because they rightfully acquired their interests in the home. According to the amended complaint, the McMullins purchased the home for $230,000. BankUnited financed the McMullins' purchase of the home from AFP by lending $207,000 secured by a mortgage on the home, which it subsequently assigned to GMAC. Because the McMullins paid fair value for their interest in the property, they did not unjustly receive a benefit.

GMAC argues that it has not been unjustly enriched because it was not a party to the sale/leaseback transaction, having been assigned their interest in the home from BankUnited, a third-party. Wilbourn cites to *HPI Health Care Services, Inc.* v. *Mt. Vernon Hosp., Inc.* as support for bringing an unjust enrichment claim against a defendant who receives a benefit from a third-party. 545 N.E.2d 672, 131 Ill. 2d 145, 137 Ill. Dec. 19 (1989). In *HPI*, the Illinois Supreme Court recognized that where the plaintiff is seeking recovery of a benefit transferred to the defendant by a third-party, retention may be unjust where "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *Id.* at 679 (citations omitted). As did the McMullins, GMAC is alleged to have acquired its interest in the property through an ordinary business transaction and not through any wrongful conduct on its part. Accordingly, its motion to dismiss Wilbourn's unjust enrichment claim will be granted.

### C.      Fricano's Motion

Fricano argues that Wilbourn may not maintain an unjust enrichment claim against him

because he is not alleged to have received any title to or portion of the equity in the home. *See* Am. Am. Compl. ¶ 157. Wilbourn does not contend that Fricano received any such interest in the home but argues in response that Fricano received a portion of the closing fee she paid to AFP and argues that this is sufficient under *HPI* because Fricano is alleged to have helped AFP take title to the home through fraud. The amended complaint, however, does not allege that Wilbourn paid any closing fee other than the non-refundable fee charged by AFP for the option to repurchase, no portion of which Fricano is alleged to have received. Accordingly, there is no factual basis on which the court may infer that Fricano took a benefit that rightfully belonged to Wilbourn, and the amended complaint therefore fails to state a claim of unjust enrichment against Fricano. Thus, the court will grant Fricano's motion to dismiss.

## CONCLUSION AND ORDER

For the foregoing reasons, the defendants' motions to dismiss are granted in part and denied in part. GMAC's motion to dismiss [# 31] is granted as to Counts III, IV, and VI, and denied as to Counts I, II, and V. The McMullins' motion to dismiss [#41] is granted as to Count VI, and denied as to Counts I, II, and V. Fricano's motion to dismiss [#46] is granted as to Counts III and VI, and denied as to Count IV. Fricano's motion to strike Wilbourn's prayer for punitive damages under Count IV is also denied. The parties are directed to report for a scheduling conference on April 29, 2010 at 8:30am.

Dated:  March 22, 2010          Enter:  _____

                                        JOAN HUMPHREY LEFKOW
                                        United States District Judge